PER CURIAM.
This case is before us on petition by The Florida Bar seeking review and modification of the recommendation of discipline for respondent made by the referee after hearings on two complaints against the respondent. The referee found all material allegations in the Bar’s complaint had been proved. It was recommended that respondent be suspended from the practice of law for one year and thereafter until such time as rehabilitation was shown and restitution had been made of certain converted funds. The Bar requests that respondent be disbarred.
*131 The hearing on the first complaint disclosed breaches of the Code of Professional Responsibility in regard to the affairs of eight clients. The facts in regard to each client are as follows:
Respondent was retained by Mr. and Mrs. Glenn A. Geer to represent them in the sale of some real estate to an out of state couple. At the closing in November 1971, he accepted checks in connection with the sale for the down payment, title insurance and fees. He placed these funds in his general account, rather than a trust account, but never disbursed the title insurance payment. Prior to the sale, a commitment and binder to insure title had been issued by William Brant and sent to respondent. On November 16, 1971, at respondent’s direction, a warranty deed was executed by Mrs. Geer as an individual and as guardian for Mr. Geer inasmuch as Mr. Geer had been declared incompetent. This deed was not recorded by respondent until June 30, 1972. By that time, Mr. Geer was restored to competency, thereby invalidating the deed. After Mr. Brant learned of the problem he contacted respondent who denied any knowledge of Mr. Geer’s restoration to competency. Respondent then attempted without success to have Mrs. Geer correct the situation. No title policy ever issued, and the binder was returned. Respondent never learned whether the buyers received good title, and he never checked with them. At his disciplinary hearing he still retained the buyers’ title insurance payments, which he said he would return. Respondent admitted that the delays in processing this transaction, especially the deed recordation, were caused by his own dilatory actions.
Respondent assisted and counseled Mrs. Doris Press in the sale of her deceased husband’s business to an associate. He drafted the agreement which was signed on August 3, 1971, calling for transfer on November 1, 1971. The terms stipulated a price of $5,200 with a down payment of $500 and the balance due before November. The buyer exercised an option to give a note drafted by respondent calling for monthly payments of $100 beginning in November. He received several payments, deposited them in his general account until they cleared, and then put the cash in his safe. After he had accumulated $700 or $800, the buyer began sending the money to a different attorney. Respondent testified he did not forward the money on to Mrs. Press because she had not provided him with a bill of sale. It is disputed whether he ever sent her one. Payment to Mrs. Press was made from respondent’s general account after a grievance committee formally began disciplinary proceedings.
Robert Wright, a blind man, hired respondent in October 1972 to compel the seller of a mobile home to perform on a contract as promised. Respondent accepted a retainer of $150 and filed suit in January 1973. Aside from two conversations with opposing counsel, nothing further was accomplished until Mr. Wright later dismissed him and sought other legal help. Although respondent claimed he had communication and service of process problems with the defendant corporation, and that he had visited the site on several occasions, he also told the referee he had done very little after January. The retainer was placed in his general account, and no refund was offered because respondent believed he had earned the money.
In October 1972 respondent represented Mr. David Lipford, who was divorced, in the sale of a house to buyers who were not represented by counsel. The buyers wrote a $1,000 check to Mr. Lipford as a down payment on October 13, 1972. They were advised the former Mrs. Lipford would have to sign the contract prepared by respondent before the transaction could be completed. Respondent made no attempt to get the signature and stated his belief that Mr. Lipford had secured her signature. In January 1973, respondent contacted the buyers after Mr. Lipford informed him they were three months in arrears. They sent three checks for $162.40 each, explaining that they had been waiting for *132 a coupon book. Respondent placed the money in his general account and, pursuant to an apparent oral agreement with Mr. Lipford, used it for a previously owed fee, for mortgage payments, and for transcripts for his clients. Six months after the October transaction, Mrs. Lipford acquired full ownership of the property and succeeded in evicting the buyers. Respondent had never contacted her regarding the purchase, and no closing ever occurred despite the fact the buyers took possession in October.
, Mrs. Rebecca Ann Paden retained respondent in November 1972 to obtain a divorce, paying an advance fee of at least $325. A complaint was filed on November 10, 1972, and a summons obtained from the clerk a week later. The summons was not forwarded to the sheriff for service on the defendant until April 25, 1973 and then it was incorrectly addressed. Respondent could not recall the reason for the delay, but did manage to secure a final decree in July 1973.
Mr. and Mrs. Tirillo paid respondent a $95 retainer in May 1973 to recover their automobile from a mechanic who refused to surrender it. After promptly filing suit, respondent did little else with the case until he turned it over to another attorney in November 1973. He claimed service of process problems; the Tirillos testified they could not contact him. The Tirillos located their car and discovered the mechanic was going to sell it, at which time they learned that respondent had turned the case over to another attorney who represented the mechanic. Eventually they got their car back, in a badly damaged state, after filing a complaint against respondent with the grievance committee. Respondent informed them he was turning the file over to another attorney, and that he had earned the fee. He failed, however, to forward their file on that case, or on a dog bite matter to another attorney despite a demand letter.
Mr. George Cuskaden hired respondent in August 1973 to collect approximately 11 delinquent accounts for him. He paid respondent $318 for costs, agreeing that the attorney’s fee would be a percentage of the amount collected. Respondent collected on one or two accounts, turned the rest over to another attorney, and left the state. The money was placed in his general account. Eventually he sent a check for the amounts he collected from Atlanta, but only after the second grievance committee meeting. He testified the reason for late payment was that the client did not demand the funds and was not concerned.
Margaret Sweat, now Chester, hired respondent to secure a dissolution of marriage in August 1973, paying him $200. Although respondent never filed suit, he told her a final hearing was scheduled in January 1974. Respondent stated he thought the case had been filed, and he admitted he was negligent. The fee from Mrs. Sweat was returned after grievances against him were heard.
Respondent testified that he maintained a trust account only once, for a month or so in a specific transaction. Thereafter, he operated his law office and personal business out of his general account in the First Marine Bank of Riviera Beach. All monies, including clients trust funds, were placed there upon receipt. Respondent admitted he was aware of the trust accounting rules, especially after the June 1973 grievance hearing, but failed to establish one. Respondent decided to leave private practice about that time. He transferred his open cases in November 1973, and took a position with the federal government in Atlanta.
The hearing on the second complaint disclosed that on July 11, 1973, respondent represented Mr. Harry M. Harris at a real estate closing from which the proceeds were to be divided eqüally. Mr. Harris’ share was to be $5,649.34 at the closing. At a previous date, Mr. Harris had signed the closing statement and other papers because he would be in New Jersey on vacation on the date of closing. Upon Harris’ return in July, he went to respondent’s of *133 fice and gave his secretary a check for $100 for legal representation. He did not then see respondent, nor was he able to contact him for three weeks. At that time respondent took Harris to lunch and broached the idea of investing his proceeds. Mr. Harris declined. At a second luncheon on or about August 31, 1973 Harris told respondent he wanted his money and was told he would have it in a few days. On September 11, respondent advised Harris that he had invested the money but would get it back as soon as possible. Despite repeated promises to return the money over the next several weeks, respondent failed to do so. In November he closed out his practice and left the area. Harris located him in Atlanta but failed to secure his money, despite several more calls and promises extending over several months. During this period Harris also contacted the real estate people to ascertain his exact share, never having been told by respondent, and learned that the check had been made out to respondent. Respondent testified that he had cashed the check the next day and used the funds for his own personal use and for investment purposes, claiming Harris’ permission. He indicated that Harris had approved the loan prior to the closing, but admitted he never gave him a note or any other written evidence of indebtedness. He later admitted that only $200 was invested, and the rest was used for personal items such as living expenses. As of the date of final hearing, respondent had not delivered any of Harris’ money.
These facts support the finding that respondent violated Disciplinary Rules 7-101(A)(2),' 7-101 (A) (3), 6-101 (A) (2), 6-101(A)(3), 9-102(A)(1), 9-102(A) (2), 9-102(B)(1), 9-102(B) (2), 9-102(B)(3), 9-102(B)(4), 1-102(A) (3), 1-102(A)(4), 1-102(A)(5) and 1-102(A)(6). It is obvious that respondent is entirely unsuited to the practice of law and that the referee’s recommendation is far too lenient. The Florida Bar’s request that respondent be disbarred is granted.
Philip E. Pfeilmair is hereby disbarred. The disbarment shall be effective on May 10, 1976, thereby giving respondent time to close out his practice and take the necessary steps to protect his clients, and it is ordered that respondent shall not accept any new business. The filing of a petition for rehearing shall not alter the effective date of this disbarment. Execution is directed to issue for the costs of these proceedings against the respondent in the amount of $1,807.12.
It is so ordered.
OVERTON, C. J., and ROBERTS, ADKINS, BOYD and ENGLAND, JJ., concur.